UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | No. 1:22-CR-00329 |
| | ) | |
| v. | ) | |
| | ) | Judge Edmond E. Chang |
| JOHN GUTIERREZ, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

John Gutierrez is charged with possessing a firearm after being convicted of a felony. 18 U.S.C. § 922(g)(1). Chicago police officers recovered the gun from him during a traffic stop. Gutierrez moves to suppress the firearm, arguing that the police had no probable cause or reasonable suspicion to pull him over. The officers say that Gutierrez violated both a city ordinance and a state law that bar drivers from "using" a cellphone while driving; he denies it. After holding an evidentiary hearing and considering the parties' arguments, the Court holds that the officers had reasonable suspicion to believe that Gutierrez violated the ordinance. The motion is denied.

## I. Factual Background

### A. The Traffic Stop

On February 1, 2022, Chicago police officers Julio Zavala and Frank Granat were on routine patrol duty, in an unmarked car, in the city's south side.[1] As Zavala drove eastbound on Pershing Road, Zavala saw a silver Toyota Corolla traveling west-bound on the same road. According to Zavala, he saw the driver of the Corolla "using" what appeared to be a cellphone while driving (much more on what is meant by "us-ing" later in this Opinion). To catch up with the Corolla, Zavala made a U-turn. The U-turn is corroborated by Officer Granat's bodycam recording. Gov. Exh. B at 0:01:12. The officers started following Gutierrez in his Corolla.

Gutierrez eventually stopped the car at a red traffic light. The police bodycam recording shows Officer Zavala driving the police car in the right-hand lane (the car's position relative to the traffic light confirms it was the right lane), and slowing the police car down. Gov. Exh. B at 0:01:12–0:01:33. According to the officers, the police car was now positioned on the passenger side of the Corolla, which (according to the officers) allowed the officers to see into Gutierrez's car through the Corolla's passen-ger-side window.

The two officers testified that they saw Gutierrez holding a cellphone in his right hand with the phone tilted towards his face, which—to the officers' thinking—

---

[1]As discussed in the Opinion, the facts are drawn from the evidentiary hearing and exhibits offered by the parties. The parties have not ordered a transcript of the hearing, so there are no citations to transcript pages.

appeared to be as if Gutierrez was using or preparing to use the phone. Zavala testi-
fied that he even saw Gutierrez's fingers manipulating the phone and touching the
phone's screen. Around a half-minute later, the officers pulled Gutierrez over.
Gov. Exh. B at 0:02:03.

Officer Zavala approached the driver's side of the Corolla, and the encounter
was video recorded on Zavala's bodycam. Gov. Exh. A at 0:00:01. As Zavala walked
up to the driver's side window—which was already rolled down—Zavala started the
conversation with "Yo, what's up?" *Id.* at 0:00:07. Gutierrez responded, "How you do-
ing sir?", and Zavala replied, "Good." *Id.* at 0:00:08–09. Zavala then accused Gutierrez
of using the cellphone—which was right there on Gutierrez's lap:

> Zavala:      (muffled) You were on the phone, man.
>
> Gutierrez:   [picking up phone from lap] Nah, I was … yea, I'm doing UberE-
>              ats, that's why [holding up phone with map on screen].

*Id.* at 0:00:10–12.

A few seconds later, Zavala asked whether Gutierrez was "concealed carry,"
meaning whether he had a concealed-carry license for a firearm, to which Gutierrez
said no. *Id.* at 0:00:15–18. Zavala then asked for Gutierrez's driver's license and in-
surance, and Gutierrez admitted that he did not have my license, explaining that he
was driving his mom's car and he was just trying to work. *Id.* at 0:00:19–28. After
Gutierrez unsuccessfully (though diplomatically) tried to talk his way out of the situ-
ation, Zavala directed Gutierrez to get out of the car. *Id.* at 0:00:46. Gutierrez got out,
and Zavala asked, "You got nothing on you?" Gutierrez admitted, "I gotta gun right

3

here." *Id.* at 0:00:47–57. The officers retrieved a gun out of Gutierrez's front sweat-shirt pocket. *Id.* at 0:01:11. Gutierrez again tried to talk his way out of the situation, explaining how dangerous it was to be delivering UberEats. *Id.* at 0:00:1:16–1:46.

## B. The Federal Charge

Based on the recovery of the gun during the traffic stop, Gutierrez was charged with being a felon in possession of a firearm under 18 U.S.C. § 922(g)(1). Gutierrez contends that the stop was unreasonable under the Fourth Amendment and moves to suppress the gun. R. 29, Def.'s Mot.[2] The thrust of Gutierrez's argument is that "he was not using his cellphone within the meaning of Chicago municipal law" and that "even if the officers had seen Mr. Gutierrez with a cellphone that is not enough to conclude he was violating the law." Def.'s Mot. at 1, 3. In response, the government argues that the stop was based on reasonable suspicion that Gutierrez had violated the Chicago ordinance and the Illinois law that ban drivers from "using" a cellphone while driving. To resolve any factual disputes, the Court held an evidentiary hearing. Afterwards, the parties filed supplemental briefs. R. 65, 66, 67.

## III. Analysis

## A. Fourth Amendment

The Fourth Amendment provides that the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and sei-zures, shall not be violated …." U.S. Const. amend. IV. Given the text, not

---

[2]Citations to the record are "R." followed by the docket entry number and, if needed, a page or paragraph number.

surprisingly the Supreme Court has held that the "ultimate touchstone of the Fourth Amendment is reasonableness." *Lange v. California*, 141 S. Ct. 2011, 2017 (2021) (cleaned up).[3] And "[r]easonableness, in turn, is measured in objective terms by examining the totality of the circumstances." *Ohio v. Robinette*, 519 U.S. 33, 39 (1996).

"Traffic stops are seizures, so they must be reasonable under the circumstances." *United States v. Cole*, 21 F.4th 421, 427 (7th Cir. 2021) (citing *Whren v. United States*, 517 U.S. 806, 809 (1996)). Likewise, to "support an investigatory stop, officers need only reasonable suspicion—that is, a particularized and objective basis for suspecting the particular person stopped of breaking the law." *United States v. Shields*, 789 F.3d 733, 745 (7th Cir. 2015) (quoting *Heien v. North Carolina*, 574 U.S. 54, 60 (2014)) (cleaned up). The Seventh Circuit has held that the suspicion that a defendant committed a traffic offense in violation of the Chicago Municipal Code is sufficient to create reasonable suspicion to support an investigatory stop. *See, e.g.*, *Shields*, 789 F.3d at 745 ("Because Mr. Shields does not dispute that he violated the Chicago Municipal Code by parking in the cross walk, the officers clearly had an objective basis to believe that he was violating the law."). Reasonable suspicion does not require that the officers be *actually* correct that the suspect violated the law: instead, the question is whether officers "reasonably believed that [they] saw a traffic violation, not whether [the suspect] actually violated the statute." *Cole*, 21 F.4th at 428.

---

[3]This Opinion uses (cleaned up) to indicate that internal quotation marks, alterations, and citations have been omitted from quotations. *See* Jack Metzler, *Cleaning Up Quotations*, 18 Journal of Appellate Practice and Process 143 (2017).

### B. "Using" a Cellphone under
### Illinois Law & Chicago Ordinance

Both state law and city ordinance ban drivers from "using" cellphones while driving, with certain exceptions. In particular, the Illinois statute says that a driver is not permitted to "operate a motor vehicle on a roadway while *using* an electronic communication device ...." 625 ILCS 5/12-610.2(b) (emphasis added). The Chicago ordinance likewise says that "no person shall drive a motor vehicle while *using* a mobile ... telephone." MCC § 9-76-230(a) (emphasis added).[4] Both the state law and the city ordinance have an exception for hands-free use of cellphones, 625 ILCS 5/12-610.2(d)(3), MCC § 9-76-230(b)(2). Before elaborating on the interpretation of "using" in the statute and ordinance, the Court turns to the factual findings.

### C. Factual Findings

The goal of the evidentiary hearing was to figure out exactly what (if anything) the officers saw Gutierrez doing with the cellphone. After hearing testimony from Officers Zavala and Granat, the Court credits that the officers saw, at the least, Gutierrez holding a cellphone in his hand, with the cellphone faced towards himself, while driving the Corolla.

First, Officer Zavala credibly testified that he initially—when crossing paths with Gutierrez's car and before making the U-turn and getting another look—saw Gutierrez "using" a cellphone. At the evidentiary hearing, neither the government

---

[4]The Municipal Code of Chicago (which is cited as MCC for convenience's sake in this Opinion) can be found at https://codelibrary.amlegal.com/codes/chicago/latest/chicago_il/0-0-0-2595356.

nor the defense asked Zavala to elaborate on what Zavala meant by "using" during this first sighting. But Zavala's observation prompted him to make a U-turn. At the hearing, Granat credibly testified that Zavala told Granat that someone was driving while using a cellphone. This version of events—in which Zavala saw Gutierrez using a cellphone—all makes sense: no other motive has been suggested as to why Zavala would decide to make a U-turn to pull almost alongside of Gutierrez, and naturally Zavala told Granat why Zavala was making a U-turn. Nor were, as the defense seemed to suggest at the hearing, the windows of Gutierrez's car tinted. The officers credibly testified otherwise and the bodycamera videos show that the Corolla windows were not tinted (though some parts had some of the griminess that Chicago weather tends to deposit on car windows).

After the U-turn, the officers had the chance to pull almost alongside Gutierrez's car at the red traffic light, and thus could see Gutierrez through his passenger-side window. Here again Officer Zavala credibly testified that the officer saw Gutierrez holding, in his right hand, the cellphone chin high. Likewise, Officer Granat credibly testified that he saw Gutierrez holding the cellphone in his right hand, with the phone facing Gutierrez.

Aside from the testimony and the circumstances, that version of events is also supported by the bodycamera recording of Zavala's roadside conversation with Gutierrez. Zavala's bodycamera recording, at the nine-second mark, actually shows Gutierrez's cellphone sitting right on his lap. Gov. Exh. A at 0:00:09. As discussed earlier, Zavala accused Gutierrez of using the phone: "You were on the phone, man."

7

*Id.* at 0:00:09. Gutierrez picked up the phone from his lap and admitted, "Nah, I was … yea, I'm doing UberEats, that's why." *Id.* at 0:00:10–12. He then showed Zavala the cellphone screen—which had a map on its display. *Id.* at 0:00:14. Indeed, the recording does *not* show Gutierrez touching the screen from the time that he picks up the phone to the time that the map is shown to Zavala. *Id.* at 0:00:10–14. So Gutierrez did not have to activate the app, or swipe over to the UberEats app, or do anything else—the map was already displayed on the screen.[5] This supports the officers' testimony that Gutierrez was holding the cellphone and apparently looking at it. It also bears noting that, despite otherwise trying to talk his way out of the situation, at no time during the traffic stop did Gutierrez deny that he was using the phone or that there was no way that the officers could have seen him using the phone. What's more, given that the officers had activated their bodycameras to record the discussion with Gutierrez, it would have been extremely risky for the officers to just make up out of thin air the cellphone-use observation. Consider, for example, if the phone were in the glove compartment, or if no app were opened on the phone. Then the driver would have been able to assert—on video—that it was impossible or improbable for the officers to have seen him using the phone.

---

[5]Obviously, Gutierrez's admission that he was "doing UberEats" and the map display on the phone are facts that were *not* known to the officers when they pulled him over. So those facts cannot be considered in assessing whether the earlier-known facts amount to reasonable suspicion or probable cause. Instead, the admission and the map display *corroborate* the officers' version of the earlier-observed facts.

All of this evidence outweighs the defense counterarguments. One line of cross-examination focused on the arrest report and its absence of the details on what the officers meant by "using" the cellphone. It is true that the arrest report's narrative section simply said that the officers observed the driver "using cellphone while operative vehicle." R. 60-1, Exh. 1 at 2. And perhaps some officers would have included in the report the details on what "using" meant in that context. But it is not unusual for arrest reports—which are just summaries, as Officer Granat testified—to omit a detail-by-detail recitation of what underlies an otherwise commonly understood term. Plus, it is even less unusual that the specifics were omitted given Gutierrez's on-camera admission that he was "doing UberEats" and on-camera display of the map on the phone. So, the government proved that the officers saw Gutierrez holding the phone in his right hand, with the phone facing him, while driving the car.

Having said that, the government fell short in proving that the officers saw Gutierrez tapping the phone screen with his fingers and that the officers saw that the screen was illuminated. Even during the witness preparation, the officers did not say that they saw those things. And, just as importantly, it would not have been necessary for Gutierrez to be tapping the phone screen with his fingers if he was just looking at the UberEats map. What the government did prove is that Gutierrez was holding the cellphone in his right hand, chin high, with the phone facing him. With those facts in mind, the Court turns to whether those facts amount to reasonable suspicion for the traffic stop.

9

### D. Reasonable Suspicion & "Using" a Cellphone

"Reasonable suspicion exists when, considering the totality of the circum-stances, an officer has a particularized and objective basis for suspecting the partic-ular person stopped of criminal activity." *Cole*, 21 F.4th at 433 (cleaned up) (quoting *Navarrette v. California*, 572 U.S. 393, 396–97 (2014)). A mere "hunch is not enough, but the likelihood of criminal activity need not rise to the level required for probable cause, and it falls considerably short of satisfying a preponderance of the evidence standard." *Id.* (cleaned up) (quoting *United States v. Arvizu*, 534 U.S. 266, 274 (2002)). Officers are also allowed to "draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person." *Id.* (cleaned up) (quoting *Arvizu*, 534 U.S. at 273).

This standard was met here: the observation of Gutierrez holding the cellphone with the phone facing him, chin high, while driving, amounts to reasonable suspicion that he was "using" the phone in violation of Illinois law and the Chicago ordinance. There is no explicit definition of "using" a cellphone under Illinois law. But the *exceptions* to liability under the statute demonstrate that a driver need not be actively tapping the phone on an app to be considered "using" the phone. In setting forth an exception for hands-free mode, Section 12-610.2 still labels a driver as "using" a phone even when the phone is in hands-free mode:

(d) This Section does not apply to:

10

> (3) a driver *using* an electronic communication device in hands-free or voice-operated mode ….

625 ILCS 5/12-610.2(d)(3) (emphasis added). For its part, the Chicago ordinance contains a similar exception for "using," that is, an exception to liability that shows that the active tapping on the phone is not needed to count as "using" the phone:

> (b) The provisions of this section shall not apply to:
>
> > (2) Persons *using* a telephone with a "hands free" device allowing the driver to talk into and listen to the other party without the use of hands.

MCC 9-76-230(b)(2) (emphasis added). Also, the Chicago ordinance has a broad, *non-exclusive* listing of what qualifies as "using" a phone, and some of those activities do not require active tapping on the phone:

> "Using a mobile … telephone" shall include, but not be limited to, the following activities: (1) talking or listening to another person on the telephone; (2) text messaging; (3) sending, reading[,] or listening to an electronic message; or (4) browsing the internet via the mobile … telephone.

MCC 9-76-230(a)(1)–(4). Under the Chicago ordinance, a driver is still "using" the phone if the driver is on a phone call or reading an e-mail, neither of which would require the driver to be tapping on the phone.[6]

---

[6]It is worth noting that, under the party-presentation principle, *United States v. Sineneng-Smith*, 590 U.S. 371, 375–76 (2020), the Court does not consider whether the officers made a reasonable mistake of *law*. *Heien v. North Carolina*, 574 U.S. 54, 61 (2014). The government did not mention that argument in either its pre-hearing brief, R. 36, or the post-hearing brief, R. 66. During oral argument, immediately after the witness testimony at the hearing, the government made a fleeting mention of a possible mistake of law, but the argument was not developed there (and not developed in the briefs).

As applied here, neither Illinois law nor the Chicago ordinance requires the officers to have observed Gutierrez actively tapping on the phone. Instead, it is enough—for *reasonable suspicion* to conduct a traffic stop—for Gutierrez to be holding the phone, chin high, with the phone facing him. The key is the standard of proof—not beyond a reasonable doubt, not by a preponderance, and not even probable cause. Indeed, the credited version of events would almost surely not satisfy a reasonable-doubt standard, and perhaps not even a preponderance standard. But when an officer sees a driver holding a phone up chin high with the phone facing the driver, that is a particularized set of facts on which to suspect that the driver is "using" the phone in violation of Illinois law and the Chicago ordinance. Officers may reasonably conclude that most drivers who hold up a phone, chin high, while driving are using the phone. It is of course possible there might be a reason to occupy a hand with a phone and hold it that way while driving and yet not be using the phone. But it is reasonable to infer that most drivers do not hold a phone like that without using the phone.

Against this, the defense cites *United States v. Boatright*, 678 F. Supp. 3d 1014, 1032–33 (S.D. Ill. 2023), but that case is distinguishable. *See* R. 67, Def.'s Supp. Br. at 1. In *Boatright*, the district court's direct holding was that reasonable suspicion was lacking where an officer "merely saw [the defendant] holding a cellphone." *Boatright*, 678 F. Supp. 3d at 1033. Here, the officers saw more than Gutierrez just holding a cellphone—he was holding it chin high and the phone was facing him. That goes beyond the fact of merely observing a driver holding a cellphone. It is true, however,

12

that earlier in the opinion in *Boatright* (before the opinion said that the officer "merely saw Boatright holding a cellphone," *id.* at 1033), the officer is described to have said that the driver was holding the cellphone "up to the left," *id.* at 1032. It is not clear from the factual description what "up to the left" means, and whether that is similar to (as in this case) a chin-high position, with the phone facing the driver. In any event, as explained earlier, the question for Fourth Amendment purposes is *not* whether the observed conduct certainly violates the ban on using a cellphone. In-stead, the question is whether the observed facts give rise to a *reasonable suspicion* that Gutierrez was using the phone. Given how odd it would be for Gutierrez to hold the phone, chin high, facing him *without* using it, the officers had reasonable suspicion to believe that he was violating the ban on using the pone while driving.[7]

With the reasonableness of the traffic stop established, there is no basis (and the defense does not argue any other basis) to exclude the subsequent admissions by

---

[7]Gutierrez also cites *United States v. Paniagua-Garcia*, 813 F.3d 1013, 1013 (7th Cir. 2016), *see* Def.'s Mot. at 3, but that case applied an extremely narrow Indiana law, which at the time banned *only* texting. "*All* other uses of cellphones by drivers are allowed …." *Paniagua-Garcia*, 813 F.3d at 1013 (emphasis in original). Lastly, Gutierrez's supplemental brief also cites two state court cases. Def.'s Supp. Br. at 2 (citing *State v. Morsette*, 924 N.W.2d 434, 440 (N.D. 2019), and *State v. Rabanales-Ramos*, 359 P.3d 250, 256 (Or. App. Ct. 2015). But those cases are distinguishable because they interpret state statutes with operative language far narrower than the Illinois law and city ordinance. Under North Dakota law, officers needed to have reasonable suspicion that an "electronic message" was being composed, read, or sent by the driver. *Morsette*, 924 N.W.2d at 437–39. In Oregon, the intermediate appellate court interpreted the term "uses" in the state law as "limited to use of a mobile communication device for the purpose of voice or text communication." *Rabanales-Ramos*, 359 P.3d at 254.

Gutierrez, including the admission that he had a gun on him. The motion to suppress is denied.

## IV. Conclusion

The motion to suppress is denied. If the parties wish to engage in conditional plea negotiations, then they shall begin promptly; if the parties want a trial date, then they shall confer on the estimated length of the trial. The parties shall file a status report on May 2, 2024, with an update.

ENTERED:

      s/Edmond E. Chang

Honorable Edmond E. Chang
United States District Judge

DATE: April 22, 2024

14